# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RICHARD LYNN DOPP, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. CIV-16-1164-G ) |
| BUDDY HONAKER et al., | ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Now before the Court is the Motion for Summary Judgment (Doc. No. 106) of Defendants Buddy Honaker, Joel McCurdy, Shirley May, Bob Thompson, DO, and Jeffrey Troutt, DO (the "ODOC Defendants"). Plaintiff Richard Lynn Dopp has filed a Response (Doc. No. 107), and the ODOC Defendants have replied (Doc. No. 108).

BACKGROUND

Plaintiff's sole surviving 42 U.S.C. § 1983 claim stems from the medical care he received while incarcerated (1) from July 1, 2015, to October 11, 2016, at Cimarron Correctional Facility ("CCF") (a facility in Cushing, Oklahoma, operated by a company formerly known as Corrections Corporation of America) and (2) from October 12, 2016, to April 20, 2017, at North Fork Correctional Center ("NFCC"), a facility operated by the Oklahoma Department of Corrections ("ODOC"). *See* Am. Compl. (Doc. No. 9) at 8-9, 11, 12-20; *see also Dopp v. Honaker*, No. CIV-16-1164-D, 2018 WL 3301526, at *1 (W.D. Okla. Jan. 24, 2018) (R. & R.), *adopted in part*, 2018 WL 1447876 (W.D. Okla. Mar. 23,

2018).¹ The present Motion concerns the allegedly improper treatment Plaintiff received from the ODOC Defendants while housed at these facilities.² Plaintiff seeks compensatory and punitive damages as well as injunctive relief, costs, and fees. *See* Am. Compl. at 9, 10, 11.

STANDARD OF REVIEW

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party. *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

While the Court construes a pro se litigant's pleadings liberally, all parties must adhere to applicable procedural rules. *See Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007). A party that moves for summary judgment has the burden of showing that the undisputed material facts require judgment as a matter of law in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, the nonmovant need not convince the Court that it will prevail at trial, but it must cite sufficient evidence

---

¹ References to documents electronically filed in this Court use the CM/ECF pagination.
² The non-ODOC Defendants associated with Plaintiff's allegations also have moved for summary judgment. The Court addresses that motion by separate order.

admissible at trial to allow a reasonable jury to find in the nonmovant's favor—i.e., to show that there is a question of material fact that must be resolved by the jury. *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). Parties may establish the existence or nonexistence of a material disputed fact through:

- citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

- demonstration "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A), (B).

When assessing the ODOC Defendants' Motion, the undersigned has treated the factual allegations of Plaintiff's verified filings (e.g., the Amended Complaint and Plaintiff's ODOC Response), and of the affidavits submitted by the ODOC Defendants, as affidavit or declaration evidence to the extent those allegations are sworn or declared under penalty of perjury and are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *see also* 28 U.S.C. § 1746.

## ANALYSIS

### I. *Individual-Capacity Claims: Qualified Immunity*

The ODOC Defendants first argue that they are entitled to qualified immunity on the claims raised against them in their individual capacities. Qualified immunity shields government officials performing discretionary functions from personal liability "if their

3

conduct does not violate clearly established rights of which a reasonable government official would have known." *Graves v. Thomas,* 450 F.3d 1215, 1218 (10th Cir. 2006) (internal quotation marks omitted). "Qualified immunity is both a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation." *Estate of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017) (alteration, omission, and internal quotation marks omitted).

   A. *Applicable Standard*

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established" at that time. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). This determination is generally made based on "the plaintiff's version of the facts"; however, such account "must find support in the record" if he or she is to defeat a qualified-immunity defense at this stage of litigation. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).

If the plaintiff demonstrates that the defendant violated a clearly established constitutional right, then the defendant "bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). "In determining whether both parties have satisfied their burdens, the court must evaluate the evidence in the light most favorable to the non-moving party." *Hinton v. City of Elwood*, 997 F.2d 774, 779 (10th Cir. 1993).

### B. *Plaintiff's Failure to Rebut the Assertion of Qualified Immunity*

Of the two prongs required for a plaintiff's initial showing, the district court has discretion as to which to address first. *Martinez*, 563 F.3d at 1088. As set forth below, the undersigned finds that Plaintiff has failed to show the violation of a constitutional right, and therefore does not proceed to the other prong of the inquiry.

#### 1. *Relevant Facts*[3]

Plaintiff filed his Amended Complaint on April 20, 2017, alleging, in relevant part, that the ODOC Defendants were deliberately indifferent to Plaintiff's medical needs in violation of the Eighth Amendment when treating Plaintiff for severe pain caused by his "serious degenerative medical condition" of "cervical foraminal stenosis neck bone nerve cord impingement." Am. Compl. at 8-9, 10-17. The Court has previously summarized his allegations:

> Plaintiff has been diagnosed with a degenerative spinal condition that causes severe, chronic pain. . . . . While at CCF, Plaintiff received a previously scheduled appointment to be evaluated by a neurosurgeon at the OU Medical Center; the appointment resulted in Plaintiff's examination by a "screener" who advised Plaintiff that surgery could correct his condition but OU Medical Center would not provide it due to budgetary constraints. Plaintiff "then requested Dr. Paine, T. Sellers, and S. May to schedule him to see an independent medical facility such as Laser Institute in OKC, OK, to provide the corrective surgery, but said requests were denied." *See* Am. Compl. at 13. Plaintiff also provided the CCA Defendants with "copies of results of totally . . . independent medical facility, North American Spine Institute (NASI), . . . after they reviewed [Plaintiff's] 2014 MRI CD images. . . . . NASI concluded [Plaintiff] required surgical fusion to correct his lower neck bone degenerative condition and relieve the pain caused by the nerve cord impingement." *Id.* at 13. Plaintiff alleges he also provided this information to ODOC Defendants Honaker and McCurdy and all these defendants

---
[3] Facts relied upon are uncontroverted or, where genuinely disputed, identified as such and viewed in the light most favorable to Plaintiff.

5

refused to provide or recommend surgery. *Id.* at 14. After Plaintiff's transfer to NF[CC] on October 12, 2016, Plaintiff allegedly provided the same information to Defendant May (then NF[CC]'s health services administrator) and [Defendant] Thompson, which resulted in the ODOC Defendants (including [Defendants] Troutt and McCurdy) ordering and reviewing the 2017 MRI. But Dr. Thompson told Plaintiff that "ODOC would [rather] feed [Plaintiff] pain pills for the rest of his life than provide any corrective surgery." *Id.* at 18.

*Dopp*, 2018 WL 1447876, at *5 (first, second, seventh, and eighth alterations and second, third, and fourth omissions in original); *see also id.* at *2 (accepting two exhibits (Doc. Nos. 71-1 and 71-2) as part of Plaintiff's pleading), *6 (noting that Plaintiff's remaining § 1983 claim regards "surgical treatment of his medical condition").

The following facts are material to Plaintiff's Eighth Amendment claim against the ODOC Defendants and are supported by the record:

- Plaintiff was transferred to CCF on June 30, 2015, and remained there until his transfer to NFCC on October 11, 2016. ODOC Special R. Ex. 1 (Doc. No. 46-1) at 2.

- During the relevant time period, the ODOC Defendants were all employees of ODOC. Defendant Honaker was the Chief Medical Services Administrator. Defendant McCurdy was Chief Medical Officer. Defendant May was the Chief Health Services Administrator. Defendant Thompson was the facility physician at NFCC. Defendant Troutt was ODOC Medical Division Regional Director. Am. Compl. at 4-6; ODOC Defs.' Answer (Doc. No. 75) at 2, 3.

- On July 1, 2015, a nurse noted on a transfer screening that Plaintiff was taking ibuprofen and was being placed on Neurontin (gabapentin). ODOC Special R. Ex. 21 (Doc. No. 52-2) at 4.

- On July 14, 2015, Plaintiff was seen at the OU Medical Center Neurosurgery Clinic ("OUMC Neurosurgery") for his complaints of neck pain and headaches. *Id.* at 8-9. The record from that visit notes that Plaintiff had been given an MRI in December 2014 that was interpreted as showing severe left-side stenosis at C6-7. The physician assistant's treatment note reflected completely normal examination results, other than some tenderness on his cervical spine, and diagnosed cervicalgia and degenerative disc disease. Plaintiff was advised to "[c]ont[inue] [his] current

6

- [treatment] plan" and follow up as needed, with "*[n]o surgical intervention planned*." *Id.* at 8 (emphasis added).[4]

- On July 21, 2015, a prison nurse issued a "lay-in slip" at Plaintiff's request, exempting Plaintiff from standing for long periods of time, walking long distances, or lifting more than 15 pounds. *Id.* at 12-13.

- On July 30, 2015, Plaintiff was examined in person. *Id.* at 17-18. The visit note reflects complaints of daily headaches that are "like his head is being ripped off" but no complaints with his arms or shoulders. Plaintiff told Defendant Paine that the Neurontin "does not help that much." Defendant Paine noted the December 2014 MRI findings, including a lack of significant canal stenosis. Defendant Paine listed multiple physical findings from his examination of Plaintiff, including that Plaintiff was in no apparent distress and displayed no evidence of limitation from pain or discomfort in his head movement. Defendant Paine diagnosed Plaintiff with "Grade I-II Intermittent neck pain that p[re]cipitates [headaches]" and prescribed ibuprofen. The "Plan of Action" recorded for this visit states: "No evidence of radiculopathy in [upper extremities] . . . . Obtain records from OUMC Neurology." Defendant Paine further noted that he saw no evidence of vascular headache and that he discussed a trial of an additional medication (venlafaxine) with Plaintiff. *Id.*

- On September 25, 2015, Plaintiff submitted a Request for Health Services stating that he had not received a medication mentioned by Defendant Paine and that Plaintiff "need[ed]" to be "sent to [illegible] Spine & Laser Institute for corrective surgery." A staff nurse responded that Plaintiff was receiving the medicine prescribed by Defendant Paine ("Last given [to keep on person] 9/24/15") and that Plaintiff had been scheduled to see a nurse. *Id.* at 19.

- An October 15, 2015, Request for Health Services indicated that Plaintiff had indeed received the new medication of "Effexor/venlafaxine" but he requested that it be stopped due to side effects and that he again be prescribed Neurontin. *Id.* at 25. Plaintiff was seen by a nurse two days later and thereafter signed waivers to stop taking the Effexor. *Id.* at 26-27, 31.

- On November 10, 2015, Plaintiff was examined by Defendant Paine in connection with his request for Neurontin. Plaintiff complained of chronic neck pain and "describe[d] [headaches] associated with neck pain and muscle spasm." Plaintiff's physical exam was normal, and Defendant Paine diagnosed "Chron[i]c neck pain associated Spinal Stenosis." At Plaintiff's request, Defendant Paine discontinued Effexor and prescribed ibuprofen and Neurontin. Defendant Paine found "[n]o

---

[4] Plaintiff alleges that someone at OUMC Neurosurgery told him that the facility would not provide surgery to Plaintiff due to financial considerations, but there is no support for this allegation in the treatment notes or elsewhere in the record beyond Plaintiff's verified pleading. *See* Am. Compl. at 16.

7

signs of neuromuscular compromise"; he directed Plaintiff to continue his range-of-motion and strengthening exercises and return to clinic as needed. *Id.* at 33-34.

- Plaintiff was seen by Defendant Paine on February 1, 2016, and requested an increase in his Neurontin. Defendant Paine noted normal exam findings and also noted Plaintiff's statement that he "[w]ants to have surgery." Defendant Paine diagnosed cervical spinal stenosis, adjusted Plaintiff's medications, and noted:

    > OUMC neurosurgeons have reviewed offender and MRI are treating conservatively. Neck pain causing insomnia and [headaches]. Will increase AM does of gabapentin to 800 mg and increase 600 mg in PM. I believe he is doing well at this time with conservative management. Will cont. to follow as needed.

    *Id.* at 41-42.

- The April 11, 2016 treatment record by Defendant Paine states that Plaintiff did not complain of any changes to his headaches and neck pain and had normal exam findings other than "deep left para-cervical tenderness at base of neck." *Id.* at 50 ("[Plaintiff] easily move[s] head and neck in extreme positions w/o c/o pain or neurologic [symptoms]."). Defendant Paine diagnosed Plaintiff with degenerative joint disease of cervical spine, chronic neck pain, and tension headaches and increased his gabapentin to 800 mg twice a day. For "Plan of Action," Defendant Paine stated: "No progression of symptoms or neurologic changes. I reviewed MRI results again with [Plaintiff] with OUMC Neurology consult recommendations to [treat] conservatively and [return as needed]. Per [Plaintiff's] report no new [symptoms] have developed and he is willing to change . . . medications. He is instructed to [return to clinic] if new or worsening [symptoms] develop[]. ROM exercise[s] again reviewed." *Id.* at 50-51.

- On a July 5, 2016 treatment note, Plaintiff is reported to have stated that OUMC "denied his surgery" but that he believes he needs surgery and an updated MRI and that "his mother sent the films to a facility in Dallas who reports that he needs cervical fusion now." Defendant Beard noted normal exam results, other than "pain at times" with head movement, ordered a Neurontin refill, and noted that she would discuss Plaintiff's case with Defendant Paine to develop a plan. *Id.* at 59-60.

- Soon thereafter, Plaintiff requested an updated MRI. *Id.* at 62. On July 26, 2016, Plaintiff was again seen by Defendant Beard, who examined Plaintiff and noted:

    > [Plaintiff] demands a new MRI and then be scheduled for surgery as appropriate. At this time I have discussed this case with [Plaintiff]. As he has no symptoms that interfere with []his [activities of daily living] . . . or strength I believe that an MRI is not warranted at this time. He has presented a letter from Spine Institute in Dallas Texas where he is being recommended spine surgery based on imaging from greater than 3 years ago. [H]e has not been seen by a physician

8

> there or evaluated in any[]way. He has been offered an MRI prescription from their facility. I have included a copy of this correspondence with this visit.
>
> I have again discussed the risks and benefits of surgery of the neck with [Plaintiff]. He states that [he] does not care about any of them and is convinced that surgery is his only option. He states that he has tremendous pain and just wants it taken care of. Strength is completely intact in bilateral extremities, no [cranial nerve] focal deficits have been identified. . . . .
>
> I will discuss case with Dr. Paine and with the regional medical director. I feel at this time an MRI is not warranted but if further discussion reveals a need then will proceed.

*Id.* at 65-66; *see also id.* at 55-56, 64 (correspondence to Plaintiff from North American Spine); Am. Compl. at 13 ("[I]n June/July 2016, [Plaintiff] showed & provided [Defendants] Paine, Baird, Neefe, & Neau, copies of results of . . . North American Spine Institute, . . . after they reviewed [Plaintiff's] 2014 MRI CD images . . . . NASI concluded [Plaintiff] required surgical fusion . . . . ."); Am. Compl. Exs. 6, 7 (Doc. Nos. 9-6, 9-7); Doc. No. 71-1.

- On August 9, 2016, Defendant Beard submitted a request for a neurosurgery consult to regional medical director Defendant Neau. CCA Defs.' Mot. Ex. 2 (Doc. No. 110-2) at 55-57. Defendant Neau requested more information, "carefully considered" the request, and ultimately denied the request on August 30, 2016. Neau Aff. ¶¶ 11-14 (Doc. No. 110-6).

- On October 3, 2016, Plaintiff met with Defendant Paine and spent most of the visit "explaining why he believes a neck fusion surgery has been avoided by DOC/OUMC and now CCA and current [lawsuit] filed." ODOC Special R. Ex. 21, at 72-73. Defendant Paine charted that he would recommend a follow-up appointment be scheduled at OUMC Neurosurgery to reassess Plaintiff's complaints. *Id.* On October 10, 2016, Defendant Paine did submit an order for this appointment. CCA Defs.' Mot. Ex. 2, at 60. The next day, Plaintiff was transferred to NFCC. ODOC Special R. Ex. 21, at 76-77.

- On October 13, 2016, Plaintiff put in a Request for Health Services regarding several items, including an appointment with "an independent neurologist/neurosurgeon at Laser Spine Institute or equivalent for corrective surgical fusion on my neck." *Id.* at 80. On October 24, 2016, Plaintiff was seen by Defendant Thompson. The treatment note states that Defendant Thompson reviewed Plaintiff's records and his exam noted no distal radiculopathy. They had a "long disc[u]ssion" and Defendant Thompson charted an order for Plaintiff to get a head CT due to his headache complaints. *Id.* at 81-82.

- On November 1, 2016, Plaintiff was seen by Defendant Thompson for his head and neck pain. For his treatment plan, Defendant Thompson prescribed Ultram and

9

noted that he would await the results of Plaintiff's head CT before completing the consult for neurosurgery. *Id.* at 86.

- The head CT was performed at Lindsay Municipal Hospital on November 3, 2016, and the reviewing physician found the results to be normal. *Id.* at 89-90. Plaintiff had a follow-up visit with a facility nurse the next day with a normal physical exam. *Id.* at 91.

- On November 14, 2016, Plaintiff was seen by a facility APRN-CNP and was prescribed diclofenac for his neck pain. On December 12, 2016, Plaintiff was seen and the diclofenac was discontinued. *Id.* at 93-95, 100-01.

- Plaintiff had an appointment at OUMC Neurosurgery in January 2017 that was rescheduled to February 2017; OUMC Neurosurgery informed ODOC that Plaintiff must have an MRI prior to the appointment. Defendant Thompson requested a cervical-spine MRI on January 12, 2017, and the MRI was scheduled for February 1, 2017, at OUMC. *Id.* at 103-10, 113-14, 117-21, 123-25, 127-28.

- The MRI results were largely normal but reflected some "[m]inimal degenerative changes," particularly at C6-C7: "Disc osteophyte complex with eccentric disc bulge into the left neural foramen, bilateral uncovertebral hypertrophy results in severe left neural foraminal stenosis and spinal canal narrowing." *Id.* at 134-15.

- Plaintiff was seen at OUMC Neurosurgery on February 7, 2017. The clinic note mentioned some impressions from Plaintiff's MRI images and assessed "cervical pain left C6-7 NF stenosis." *Id.* at 132-33. The physician assistant's treatment plan included an upper-extremity electromyography ("EMG") test, "[p]ossible operative planning for a C6-7 ACDF [anterior cervical discectomy and fusion] *if active radic[ulopathy] per EMG*," and follow up as needed. *Id.* at 133 (emphasis added).

- On February 8, 2017, Defendant Thompson saw Plaintiff and transmitted a request for the EMG. *Id.* at 137-41. An upper-extremity EMG was conducted by Joshua Kershen, MD, on February 27, 2017. Dr. Kershen reported "[m]ildly abnormal" results, "consistent with a very mild median neuropathy across the left wrist." Dr. Kershen found no evidence "of a left C5-8 radiculopathy or a left brachial plexopathy" or of "a left ulnar or radial neuropathy." Dr. Kershen noted: "Reduced activation is present on needle EMG exam. Reduced activation is seen in the setting of poor effort, limitation due to pain, psychiatric disease, or [central nervous system] processes." *Id.* at 142-43.

- At Plaintiff's next two medical appointments, he told facility personnel that Dr. Kershen had performed "the wrong test." *Id.* at 146-48.

- In March 2017, Defendant May and other personnel fulfilled Plaintiff's request to replace his indomethacin with ibuprofen. *Id.* at 149, 155.

- On April 11, 2017, Plaintiff returned to OUMC Neurosurgery. The record from the visit discussed his recent MRI and EMG, noting that the latter showed "no cervical

10

radiculopathy," and stated that he did not describe radicular symptoms. The stated plan: "Consider pain management. No operative planning." *Id.* at 163; *see also id.* at 162 (Plaintiff's chart stating "No Surgery" and directing him to return as needed).

- Plaintiff filed his Amended Complaint on April 20, 2017.[5] Plaintiff's prison sentence was commuted on February 2, 2018. ODOC Defs.' Mot. Ex. 1 (Doc. No. 106-1). Plaintiff was granted parole effective May 16, 2018, and no longer is housed in an ODOC facility. ODOC Defs.' Mot. Ex. 2 (Doc. No. 106-2); Pl.'s ODOC Resp. at 2; Pl.'s Notice of Change of Address of May 21, 2018 (Doc. No. 84).

*2. Relevant Standard*

The undersigned concludes that Plaintiff has not shown the violation of a constitutional right and therefore has not met his burden in opposing summary judgment. *See Martinez*, 563 F.3d at 1088; *Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015).

To prove a § 1983 claim, a plaintiff must show "the violation of a right secured by the Constitution and laws of the United States" and "that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). As to the second element, the Tenth Circuit has "long assumed that employees of a private prison act under color of state law for purposes of § 1983 suits by inmates." *Phillips v. Tiona*, 508 F. App'x 737, 750 (10th Cir. 2013).

Regarding a violation of a federal right, the Eighth Amendment imposes upon the government an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *see also West*, 487 U.S. at 56.

---

[5] Although both parties point to medical evidence produced after the date the Amended Complaint was filed, they fail to show how this later evidence is probative of Plaintiff's claims during the time period at issue. *Cf. Spencer v. Abbott*, 731 F. App'x 731, 744 (10th Cir. 2017) (noting that the subjective inquiry on an Eighth Amendment claim is limited to consideration of the physician's knowledge at the time he or she prescribed treatment rather than the ultimate treatment that was required).

"[S]ociety does not expect that prisoners will have unqualified access to health care," however. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A violation of the Eighth Amendment will be found only if the prisoner shows that he or she suffered "acts or omissions sufficiently harmful to evidence deliberate indifference to [the prisoner's] serious medical needs." *Estelle*, 429 U.S. at 106.

In *Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005), the Tenth Circuit provided a thorough summary of the law applicable to such claims:

> A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. The test for constitutional liability of prison officials "involves both an objective and a subjective component."
>
> The prisoner must first produce objective evidence that the deprivation at issue was in fact "sufficiently serious." We have said that a "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Where the necessity for treatment would not be obvious to a lay person, the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim. Moreover, a delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain."
>
> The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's culpable state of mind. The subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference." A prison medical professional who serves "solely . . . as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role."

*Id.* at 751 (alteration and citations omitted).

12

*3. Discussion*

The Court previously found that the well-pled allegations in Plaintiff's pleading, when assumed to be true, stated a plausible Eighth Amendment claim and precluded dismissal of that claim. *See Dopp*, 2018 WL 1447876, at *6. Plaintiff argues that this finding "conclusively establishe[s]" the ODOC Defendants' deliberate indifference. *See* Pl.'s ODOC Resp. (Doc. No. 107) at 6. But Plaintiff is incorrect: to defeat the ODOC Defendants' qualified-immunity argument at the current summary-judgment stage, Plaintiff must do more: "[B]ecause . . . we are beyond the pleading phase of the litigation, [Plaintiff's] version of the facts must find support in the record" to meet each prong of his "heavy two-part burden." *Thomson*, 584 F.3d at 1312; *Estate of Redd*, 848 F.3d at 906 (internal quotation marks omitted). The Court must determine whether Plaintiff's "factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation" for deciding whether Plaintiff has demonstrated the violation of a constitutional right. *Thomson*, 584 F.3d at 1326 (Holmes, J., concurring).

The ODOC Defendants presume that Plaintiff's neck and spine condition constitutes a sufficiently serious medical need. *See* ODOC Defs.' Mot. at 28; *Estelle*, 429 U.S. at 106; *Mata*, 427 F.3d at 751. But as explained below, Plaintiff's factual allegations that are supported by the record are not sufficient to establish the subjective prong of an Eighth Amendment violation, as they do not show that the ODOC Defendants had a "culpable state of mind" and that these Defendants knew of and disregarded an "excessive risk" to Plaintiff's health. *Mata*, 427 F.3d at 751; *Farmer*, 511 U.S. at 837.

13

As a general matter, the record reflects that Plaintiff received continual medical care during his fifteen months at CCF and six months at NFCC, including various pain-relief medications, lifestyle directives, imposition of physical exemptions, specialized testing, and dozens of in-person visits with medical personnel at both prison facilities and at OUMC Neurosurgery. When a plaintiff challenges "a doctor['s] . . . exercise[] [of] his [or her] considered medical judgment," the plaintiff must show an "extraordinary degree of neglect" to satisfy the subjective component of a deliberate-indifference claim. *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006). Thus, conscious disregard of a serious medical need may be inferred when "a prison doctor . . . responds to an obvious risk with treatment that is patently unreasonable" but not when "a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition." *Id.* at 1232-33. Here, the regular and thorough treatment of Plaintiff—even if accompanied by a comment that "pills would never fix, heal, [or] correct" his condition, Am. Compl. at 18—does not reflect that the ODOC Defendants "disregard[ed] an excessive risk to [Plaintiff's] health" or "respond[ed] to an obvious risk with treatment that [was] patently unreasonable." *Farmer*, 511 U.S. at 837; *Self*, 439 F.3d at 1232; *see also Farmer*, 511 U.S. at 837 (noting that proving the subjective component requires a showing both that the prison official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the official "dr[ew] the inference").

Further, Plaintiff cannot show deliberate indifference merely because he was denied his particular requested treatment—i.e., a spinal-fusion surgery recommended by a provider who had never examined Plaintiff—during the short time period at issue. "[A]

14

prisoner who merely disagrees with . . . a prescribed course of treatment does not state a constitutional violation." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999); *see also Toler v. Troutt*, 631 F. App'x 545, 547-48 (10th Cir. 2015) ("A difference of opinion with medical staff about treatment is not actionable under the Eighth Amendment[;] nor is a disagreement among medical experts." (citing cases)). And the short delays and arranging of logistics for Plaintiff to receive his MRI and EMG test and to twice visit OUMC Neurosurgery—which ultimately did not recommend Plaintiff's requested surgery—do not reflect an unreasonable "delay[] or refus[al] to fulfill [the] gatekeeper role" on the part of any ODOC Defendant. *Mata*, 427 F.3d at 751 (internal quotation marks omitted).

"To the contrary, the record," even when "all factual disputes and reasonable inferences" are resolved in Plaintiff's favor, "shows [the ODOC Defendants] made a good faith effort to diagnose and treat [Plaintiff's] medical condition." *Mata*, 427 F.3d at 761 (granting qualified immunity where "[n]o reasonable jury could conclude" that the prison nurse acted with deliberate indifference to the prisoner's medical needs); *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). For all these reasons, Plaintiff has not met his burden to show a violation of his Eighth Amendment rights. *See Self*, 439 F.3d at 1234, 1236; *Toler*, 631 F. App'x at 547-48; *see also Dodds v. Richardson*, 614 F.3d 1185, 1196 (10th Cir. 2010) (explaining that even a supervisor cannot be held liable for an Eighth Amendment violation without a showing of a "culpable state of mind"). The evidence in the record does not permit a reasonable conclusion that these Defendants "knew of a

15

substantial risk of serious harm, and consciously disregarded it." *Boyett v. Cty. of Wash.*, 282 F. App'x 667, 675 (10th Cir. 2008) (alteration and internal quotation marks omitted).

"[I]f the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense." *A.M. v. Holmes*, 830 F.3d 1123, 1134-35 (10th Cir. 2016); *accord Estate of Booker*, 745 F.3d at 411 (noting that at summary judgment, the court "must grant qualified immunity" unless the plaintiff can meet both parts of the two-part burden). The ODOC Defendants are therefore entitled to summary judgment on the Eighth Amendment claims against them in their individual capacities.

## II. *Official-Capacity Claims*

The ODOC Defendants additionally argue that the claim for injunctive relief raised against them in their official capacities is moot and that Plaintiff has failed to show "'an ongoing violation of federal law'" such that an award of prospective injunctive relief (in the form of "order[ing] [the ODOC Defendants] to provide . . . corrective surgical fusion by competent neurosurgeon(s), and/or immediate release from ODOC custody," Am. Compl. at 9, 11) against them in their official capacities would be appropriate. ODOC Defs.' Mot. at 34-35 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)); *see also Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (noting that an exception to Eleventh Amendment immunity exists where a plaintiff sues individual officers acting in their official capacities, "alleges an ongoing violation of federal law," and "seeks prospective relief"); *Dopp*, 2018 WL 1447876, at *3, *6 (dismissing all official-capacity claims seeking money damages). The Court agrees. It is undisputed that Plaintiff is currently on parole, and there is no evidence in the record to

suggest that ODOC remains responsible for his medical care or somehow dictates the care he may seek now. In other words, he cannot show that he is being subjected to any ongoing violation of his Eighth Amendment rights by the ODOC Defendants.

"A claim will be 'deemed moot unless a proper judicial resolution settles some dispute which affects the behavior of the defendant toward the plaintiff.'" *Rachel v. Troutt*, No. CIV-15-141-R, 2017 WL 1440007, at *5 (W.D. Okla. Feb. 10, 2017) (R. & R.) (quoting *McAlpine v. Thompson*, 187 F.3d 1213, 1216 (10th Cir. 1999)), *adopted*, 2017 WL 1437890 (W.D. Okla. Apr. 21, 2017). "Because [Plaintiff] is no longer at [NFCC] and no longer under the care of [the ODOC Defendants], granting [Plaintiff's] motion for injunctive relief would have no effect in the real world . . . ." *Id.* Accordingly, this claim must be dismissed. *See McAlpine*, 187 F.3d at 1215 ("[W]hen an inmate's claim for prospective injunctive relief regarding conditions of confinement becomes moot due to the inmate-plaintiff's release from confinement, the inmate's parole . . . status does not, absent some exceptional showing, bring that claim under the narrow 'capable of repetition, yet evading review' exception to the mootness doctrine.").

## CONCLUSION

As outlined herein, Plaintiff's claims for prospective injunctive relief are DISMISSED AS MOOT. The ODOC Defendants' Motion for Summary Judgment (Doc. No. 106) is otherwise GRANTED as to Defendants Honaker, McCurdy, May, Thompson, and Troutt on the basis of qualified immunity. Judgment shall be entered accordingly.

IT IS SO ORDERED this 30th day of September, 2019.

CHARLES B. GOODWIN
United States District Judge