# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RICHARD LYNN DOPP, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | )   Case No. CIV-16-1164-G |
| | ) |
| BUDDY HONAKER et al., | ) |
| | ) |
|    Defendants. | ) |

## OPINION AND ORDER

Now before the Court is the Motion for Summary Judgment (Doc. No. 110) of Defendants Laura Neefe, Theresa Sellers, Denise Beard,[1] Yvonne Neau, MD, and C. Stephen Paine, MD (the "CCA Defendants"). Plaintiff Richard Lynn Dopp has filed a Response (Doc. No. 113), and the CCA Defendants have replied (Doc. No. 114).

BACKGROUND

Plaintiff's sole surviving 42 U.S.C. § 1983 claim stems from the medical care he received while incarcerated (1) from July 1, 2015, to October 11, 2016, at Cimarron Correctional Facility ("CCF") (a facility in Cushing, Oklahoma, operated by a company formerly known as Corrections Corporation of America) and (2) from October 12, 2016, to April 20, 2017, at North Fork Correctional Center ("NFCC"), a facility operated by the Oklahoma Department of Corrections ("ODOC"). *See* Am. Compl. (Doc. No. 9) at 8-9, 11, 12-20; *see also Dopp v. Honaker*, No. CIV-16-1164-D, 2018 WL 3301526, at *1 (W.D.

---

[1] Although Plaintiff identifies this Defendant as "Baird," the Court uses the correct spelling of "Beard."

Okla. Jan. 24, 2018) (R. & R.), *adopted in part*, 2018 WL 1447876 (W.D. Okla. Mar. 23, 2018).[2] The present Motion concerns the allegedly improper treatment Plaintiff received from the CCA Defendants while housed at CCF.[3] Plaintiff seeks compensatory and punitive damages as well as injunctive relief, costs, and fees. *See* Am. Compl. at 9, 10, 11.

## STANDARD OF REVIEW

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party. *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

While the Court construes a pro se litigant's pleadings liberally, all parties must adhere to applicable procedural rules. *See Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007). A party that moves for summary judgment has the burden of showing that the undisputed material facts require judgment as a matter of law in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, the nonmovant need not convince the Court that it will prevail at trial, but it must cite sufficient evidence

---

[2] References to documents electronically filed in this Court use the CM/ECF pagination.

[3] The Defendants associated with Plaintiff's allegations regarding ODOC officials also have moved for summary judgment. The Court addresses that motion by separate order.

admissible at trial to allow a reasonable jury to find in the nonmovant's favor—i.e., to show that there is a question of material fact that must be resolved by the jury. *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). Parties may establish the existence or nonexistence of a material disputed fact through:

- citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

- demonstration "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A), (B).

When assessing the CCA Defendants' Motion, the undersigned has treated the factual allegations of Plaintiff's verified filings (e.g., the Amended Complaint and Plaintiff's CCA Response), and of the affidavits submitted by the CCA Defendants, as affidavit or declaration evidence to the extent those allegations are sworn or declared under penalty of perjury and are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *see also* 28 U.S.C. § 1746.

ANALYSIS

I. *Defendants Sellers and Neefe*

The CCA Defendants first argue that Plaintiff has shown no "affirmative link" between any action taken by either Defendant Sellers or Defendant Neefe and the alleged constitutional deprivations, as required to hold someone individually liable on a § 1983

3

claim. *See* CCA Defs.' Mot. at 25-30; *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767-68 (10th Cir. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Plaintiff responds that these Defendants "had minimal involvement" and that he does not object to their "dismiss[al]" from this lawsuit. Pl.'s CCA Resp. at 4.

Based upon Plaintiff's express representation, the Court shall dismiss Defendant Sellers and Defendant Neefe from this lawsuit pursuant to Federal Rule of Civil Procedure 41(a)(2).

II. *The Remaining CCA Defendants*

Defendants Beard, Neau, and Paine dispute many of Plaintiff's factual allegations and specifically deny that Plaintiff has shown that a genuine issue exists as to whether they acted with the requisite deliberate indifference in providing Plaintiff medical treatment at CCF. *See* CCA Defs.' Mot. at 18-25.

A. *Relevant Facts*[4]

Plaintiff filed his Amended Complaint on April 20, 2017, alleging, in relevant part, that the CCA Defendants were deliberately indifferent to Plaintiff's medical needs in violation of the Eighth Amendment when treating Plaintiff for severe pain caused by his "serious degenerative medical condition" of "cervical foraminal stenosis neck bone nerve cord impingement." Am. Compl. at 8-9, 10-17. The Court has previously summarized his allegations:

> Plaintiff has been diagnosed with a degenerative spinal condition that causes severe, chronic pain. . . . . While at CCF, Plaintiff received a previously

---

[4] Facts relied upon are uncontroverted or, where genuinely disputed, identified as such and viewed in the light most favorable to Plaintiff.

4

scheduled appointment to be evaluated by a neurosurgeon at the OU Medical Center; the appointment resulted in Plaintiff's examination by a "screener" who advised Plaintiff that surgery could correct his condition but OU Medical Center would not provide it due to budgetary constraints. Plaintiff "then requested Dr. Paine, T. Sellers, and S. May to schedule him to see an independent medical facility such as Laser Institute in OKC, OK, to provide the corrective surgery, but said requests were denied." *See* Am. Compl. at 13. Plaintiff also provided the CCA Defendants with "copies of results of totally . . . independent medical facility, North American Spine Institute (NASI), . . . after they reviewed [Plaintiff's] 2014 MRI CD images. . . . . NASI concluded [Plaintiff] required surgical fusion to correct his lower neck bone degenerative condition and relieve the pain caused by the nerve cord impingement." *Id.* at 13.

*Dopp*, 2018 WL 1447876, at *5 (alterations and second, third, and fourth omissions in original); *see also id.* at *2 (accepting two exhibits (Doc. Nos. 71-1 and 71-2) as part of Plaintiff's pleading), *6 (noting that Plaintiff's remaining § 1983 claim regards "surgical treatment of his medical condition"); Pl.'s CCA Resp. at 3 ("The point of all this is whether [Plaintiff] could have benefitted from corrective surgery and . . . whether [the CCA Defendants] were deliberately indifferent for failing to provide that surgery.").

The following facts are material to Plaintiff's Eighth Amendment claim against the CCA Defendants and are supported by the record:

- Plaintiff was transferred to CCF on June 30, 2015, and remained there until his transfer to NFCC on October 11, 2016. ODOC Special R. Ex. 1 (Doc. No. 46-1) at 2.

- During this time period, Defendant Beard was a certified nurse practitioner at CCF. Defendant Neau was the regional medical director for CCA. Defendant Paine was the CCF facility physician. Am. Compl. at 5; CCA Defs.' Answer (Doc. No. 76) at 2, 3.

- On July 1, 2015, a nurse noted on a transfer screening that Plaintiff was taking ibuprofen and was being placed on Neurontin (gabapentin). ODOC Special R. Ex. 21 (Doc. No. 52-2) at 4.

5

- On July 14, 2015, Plaintiff was seen at the OU Medical Center Neurosurgery Clinic ("OUMC Neurosurgery") for his complaints of neck pain and headaches. *Id.* at 8-9. The record from that visit notes that Plaintiff had been given an MRI in December 2014 that was interpreted as showing severe left-side stenosis at C6-7. The physician assistant's treatment note reflected completely normal examination results, other than some tenderness on his cervical spine, and diagnosed cervicalgia and degenerative disc disease. Plaintiff was advised to "[c]ont[inue] [his] current [treatment] plan" and follow up as needed, with "*[n]o surgical intervention planned*." *Id.* at 8 (emphasis added).[5]

- On July 21, 2015, a prison nurse issued a "lay-in slip" at Plaintiff's request, exempting Plaintiff from standing for long periods of time, walking long distances, or lifting more than 15 pounds. *Id.* at 12-13.

- On July 30, 2015, Plaintiff was examined in person by Defendant Paine regarding his request for medication refills. *Id.* at 17-18. The visit note reflects complaints of daily headaches that are "like his head is being ripped off" but no complaints with his arms or shoulders. Plaintiff told Defendant Paine that the Neurontin "does not help that much." Defendant Paine noted the December 2014 MRI findings, including a lack of significant canal stenosis. Defendant Paine listed multiple physical findings from his examination of Plaintiff, including that Plaintiff was in no apparent distress and displayed no evidence of limitation from pain or discomfort in his head movement. Defendant Paine diagnosed Plaintiff with "Grade I-II Intermittent neck pain that p[re]cipitates [headaches]" and prescribed ibuprofen. The "Plan of Action" recorded for this visit states: "No evidence of radiculopathy in [upper extremities] . . . . Obtain records from OUMC Neurology." Defendant Paine further noted that he saw no evidence of vascular headache and that he discussed a trial of an additional medication (venlafaxine) with Plaintiff. *Id.*

- On August 11, 2015, the record from the July 2015 OUMC Neurosurgery visit was faxed to Defendant Paine. Defendant Paine reviewed the record and determined that its assessment was "quite like [his] own." Paine Aff. ¶ 17 (Doc. No. 110-3).[6]

- On September 25, 2015, Plaintiff submitted a Request for Health Services stating that he had not received a medication mentioned by Defendant Paine and that Plaintiff "need[ed]" to be "sent to [illegible] Spine & Laser Institute for corrective surgery." A staff nurse responded that Plaintiff was receiving the medicine

---

[5] Plaintiff alleges that someone at OUMC Neurosurgery told him that the facility would not provide surgery to Plaintiff due to financial considerations, but there is no support for this allegation in the treatment notes or elsewhere in the record beyond Plaintiff's verified pleading. *See* Am. Compl. at 16.

[6] Plaintiff alleges Defendant Paine actually "had agreed corrective surgery may benefit [Plaintiff]" but offers no further explanation. Pl.'s Resp. at 1.

- prescribed by Defendant Paine ("Last given [to keep on person] 9/24/15") and that Plaintiff had been scheduled to see a nurse. ODOC Special R. Ex. 21, at 19.

- On September 30, 2015, Plaintiff submitted a Request for Health Services complaining that he had "requested to see [a] Doctor" about his neck condition, "Not a Nurse!" *Id.* at 21. On an October 2, 2015 treatment note, a nurse noted that she would follow up with Defendant Paine to resolve Plaintiff's question about a new medication. *Id.* at 22.

- An October 15, 2015, Request for Health Services indicated that Plaintiff had indeed received the new medication of "Effexor/venlafaxine" but he requested that it be stopped due to side effects and that he again be prescribed Neurontin. *Id.* at 25. Plaintiff was seen by a nurse two days later and thereafter signed waivers to stop taking the Effexor. *Id.* at 26-27, 31.

- On November 10, 2015, Plaintiff was examined by Defendant Paine in connection with his request for Neurontin. Plaintiff complained of chronic neck pain and "describe[d] [headaches] associated with neck pain and muscle spasm." Plaintiff's physical exam was normal, and Defendant Paine diagnosed "Chron[i]c neck pain associated Spinal Stenosis." At Plaintiff's request, Defendant Paine discontinued Effexor and prescribed ibuprofen and Neurontin. Defendant Paine found "[n]o signs of neuromuscular compromise"; he directed Plaintiff to continue his range-of-motion and strengthening exercises and return to clinic as needed. *Id.* at 33-34.

- On December 26, 2015, Plaintiff was seen by Defendant Neefe, who charted that Plaintiff had requested medication refills and also provided Plaintiff a medical lay-in slip that restricted him from extended walking and standing and from lifting greater than 15 pounds. *Id.* at 38-39.

- Plaintiff was seen by Defendant Paine on February 1, 2016, and requested an increase in his Neurontin. Defendant Paine noted normal exam findings and also noted Plaintiff's statement that he "[w]ants to have surgery." Defendant Paine diagnosed cervical spinal stenosis, adjusted Plaintiff's medications, and noted:

    > OUMC neurosurgeons have reviewed offender and MRI are treating conservatively. Neck pain causing insomnia and [headaches]. Will increase AM does of gabapentin to 800 mg and increase 600 mg in PM. I believe he is doing well at this time with conservative managment. Will cont. to follow as needed.

    *Id.* at 41-42.

- In early February 2016, Plaintiff complained that he had not been receiving sufficient Neurontin to provide the increased dosage. On February 17, 2016, a nurse noted that Plaintiff stated that the problem had been resolved. *Id.* at 43-47.

- The April 11, 2016 treatment record by Defendant Paine states that Plaintiff did not complain of any changes to his headaches and neck pain and had normal exam

7

findings other than "deep left para-cervical tenderness at base of neck." *Id.* at 50 ("[Plaintiff] easily move[s] head and neck in extreme positions w/o c/o pain or neurologic [symptoms]."). Defendant Paine diagnosed Plaintiff with degenerative joint disease of cervical spine, chronic neck pain, and tension headaches and increased his gabapentin to 800 mg twice a day. For "Plan of Action," Defendant Paine stated: "No progression of symptoms or neurologic changes. I reviewed MRI results again with [Plaintiff] with OUMC Neurology consult recommendations to [treat] conservatively and [return as needed]. Per [Plaintiff's] report no new [symptoms] have developed and he is willing to change . . . medications. He is instructed to [return to clinic] if new or worsening [symptoms] develop[]. ROM exercise[s] again reviewed." *Id.* at 50-51.

- On a July 5, 2016 treatment note, Plaintiff is reported to have stated that OUMC "denied his surgery" but that he believes he needs surgery and an updated MRI and that "his mother sent the films to a facility in Dallas who reports that he needs cervical fusion now." Defendant Beard noted normal exam results, other than "pain at times" with head movement, ordered a Neurontin refill, and noted that she would discuss Plaintiff's case with Defendant Paine to develop a plan. *Id.* at 59-60.

- Soon thereafter, Plaintiff requested an updated MRI. *Id.* at 62. On July 26, 2016, Plaintiff was again seen by Defendant Beard, who examined Plaintiff and noted:

  > [Plaintiff] demands a new MRI and then be scheduled for surgery as appropriate. At this time I have discussed this case with [Plaintiff]. As he has no symptoms that interfere with []his [activities of daily living] . . . or strength I believe that an MRI is not warranted at this time. He has presented a letter from Spine Institute in Dallas Texas where he is being recommended spine surgery based on imaging from greater than 3 years ago. [H]e has not been seen by a physician there or evaluated in any[]way. He has been offered an MRI prescription from their facility. I have included a copy of this correspondence with this visit.

  > I have again discussed the risks and benefits of surgery of the neck with [Plaintiff]. He states that [he] does not care about any of them and is convinced that surgery is his only option. He states that he has tremendous pain and just wants it taken care of. Strength is completely intact in bilateral extremities, no [cranial nerve] focal deficits have been identified. . . . .

  > I will discuss case with Dr. Paine and with the regional medical director. I feel at this time an MRI is not warranted but if further discussion reveals a need then will proceed.

  *Id.* at 65-66; *see also id.* at 55-56, 64 (correspondence to Plaintiff from North American Spine); Am. Compl. at 13 ("[I]n June/July 2016, [Plaintiff] showed & provided [Defendants] Paine, Baird, Neefe, & Neau, copies of results of . . . North American Spine Institute, . . . after they reviewed [Plaintiff's] 2014 MRI CD images

8

- . . . . NASI concluded [Plaintiff] required surgical fusion . . . . ."); Am. Compl. Exs. 6, 7 (Doc. Nos. 9-6, 9-7); Doc. No. 71-1.

- On August 9, 2016, Defendant Beard submitted a request for a neurosurgery consult to regional medical director Defendant Neau. CCA Defs.' Mot. Ex. 2 (Doc. No. 110-2) at 55-57. Defendant Neau requested more information, "carefully considered" the request, and ultimately denied the request on August 30, 2016. Neau Aff. ¶¶ 11-14 (Doc. No. 110-6). Defendant Neau specifically directed that staff should continue to follow Plaintiff clinically and that if he developed new symptoms or any "focal neural deficits," the request should be resubmitted. CCA Defs.' Mot. Ex. 2, at 55-57.

- On October 3, 2016, Plaintiff met with Defendant Paine and spent most of the visit "explaining why he believes a neck fusion surgery has been avoided by DOC/OUMC and now CCA and current [lawsuit] filed." ODOC Special R. Ex. 21, at 72-73. Plaintiff reported that he had headaches once per week with occasional incapacitating headache, although no visual changes or nausea/vomiting. Defendant Paine charted that he would recommend a follow-up appointment be scheduled at OUMC Neurosurgery to reassess Plaintiff's complaints. *Id.* On October 10, 2016, Defendant Paine did submit an order for this appointment. CCA Defs.' Mot. Ex. 2, at 60. The next day, Plaintiff was transferred to NFCC. ODOC Special R. Ex. 21, at 76-77.

*B. Relevant Standard*

To prove a § 1983 claim, a plaintiff must show "the violation of a right secured by the Constitution and laws of the United States" and "that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). As to the second element, the Tenth Circuit has "long assumed that employees of a private prison act under color of state law for purposes of § 1983 suits by inmates." *Phillips v. Tiona*, 508 F. App'x 737, 750 (10th Cir. 2013).

Regarding a violation of a federal right, the Eighth Amendment imposes upon the government an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *see also West*, 487 U.S. at 56. "[S]ociety does not expect that prisoners will have unqualified access to health care,"

9

however. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A violation of the Eighth Amendment will be found only if the prisoner shows that he or she suffered "acts or omissions sufficiently harmful to evidence deliberate indifference to [the prisoner's] serious medical needs." *Estelle*, 429 U.S. at 106.

In *Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005), the Tenth Circuit provided a thorough summary of the law applicable to such claims:

> A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. The test for constitutional liability of prison officials "involves both an objective and a subjective component."
>
> The prisoner must first produce objective evidence that the deprivation at issue was in fact "sufficiently serious." We have said that a "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Where the necessity for treatment would not be obvious to a lay person, the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim. Moreover, a delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain."
>
> The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's culpable state of mind. The subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference." A prison medical professional who serves "solely . . . as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role."

*Id.* at 751 (alteration and citations omitted).

10

### C. Discussion

The CCA Defendants do not contest, and the Court assumes, that Plaintiff's neck and spine condition constitutes a sufficiently serious medical need. *See* CCA Defs.' Mot. at 20-25; *Estelle*, 429 U.S. at 106; *Mata*, 427 F.3d at 751. But as explained below, Plaintiff's factual allegations that are supported by the record are not sufficient to establish the subjective prong of an Eighth Amendment violation, as they do not show that the CCA Defendants had a "culpable state of mind" and that the CCA Defendants knew of and disregarded an "excessive risk" to Plaintiff's health. *Mata*, 427 F.3d at 751; *Farmer*, 511 U.S. at 837.

As a general matter, the record reflects that Plaintiff received continual medical care during his fifteen months at CCF, including various pain-relief medications, lifestyle directives, imposition of physical exemptions, specialized testing, and at least 14 in-person visits with medical personnel at his prison facility and at OUMC Neurosurgery. When a plaintiff challenges "a doctor['s] . . . exercise[] [of] his [or her] considered medical judgment," the plaintiff must show an "extraordinary degree of neglect" to satisfy the subjective component of a deliberate-indifference claim. *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006). Thus, conscious disregard of a serious medical need may be inferred when "a prison doctor . . . responds to an obvious risk with treatment that is patently unreasonable" but not when "a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition." *Id.* at 1232-33. Here, the regular and thorough treatment of Plaintiff does not reflect that the CCA Defendants "disregard[ed] an excessive risk to [Plaintiff's] health" or "respond[ed] to an obvious risk

with treatment that [was] patently unreasonable." *Farmer*, 511 U.S. at 837; *Self*, 439 F.3d at 1232; *see also Farmer*, 511 U.S. at 837 (noting that proving the subjective component requires a showing both that the prison official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the official "dr[ew] the inference").

Further, Plaintiff cannot show deliberate indifference merely because he was denied his particular requested treatment—i.e., a spinal-fusion surgery recommended by a provider who had never examined Plaintiff—during the short time period at issue. "[A] prisoner who merely disagrees with . . . a prescribed course of treatment does not state a constitutional violation." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999); *see also Toler v. Troutt*, 631 F. App'x 545, 547-48 (10th Cir. 2015) ("A difference of opinion with medical staff about treatment is not actionable under the Eighth Amendment[;] nor is a disagreement among medical experts." (citing cases)). And Defendant Neau's denial of an outside neurosurgery consult shortly after the request was made (and only 13 months after Plaintiff had been seen at OUMC Neurosurgery) does not, given her review of Plaintiff's record and further inquiries into Plaintiff's condition, reflect an unreasonable "delay[] or refus[al] to fulfill that gatekeeper role." *Mata*, 427 F.3d at 751 (internal quotation marks omitted); *cf. Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992) ("Plaintiff's . . . contention that he was denied treatment by a specialist is . . . insufficient to establish a constitutional violation.").

Nor can Plaintiff demonstrate deliberate indifference because, on one occasion, he was seen by a nurse rather than by a doctor as he would have preferred.

12

> While jailers are ultimately responsible for their inmates' medical needs, *Farmer*[, 511 U.S. at 833-34], they can provide that care in a variety of ways, including access to trained personnel such as guards in the first instance, nurses, and physicians' assistants. The Eighth Amendment requires nothing more as a general matter. While access to a medical doctor may be necessary in certain situations, no constitutional violation occurs unless medical care is intentionally or recklessly denied.

*Boyett v. Cty. of Wash.*, 282 F. App'x 667, 673 (10th Cir. 2008) (citations omitted).

"To the contrary, the record," even with factual disputes and reasonable inferences resolved in Plaintiff's favor, "shows [the CCA Defendants] made a good faith effort to diagnose and treat [Plaintiff's] medical condition." *Mata*, 427 F.3d at 761 (granting qualified immunity where "[n]o reasonable jury could conclude" that the prison nurse acted with deliberate indifference to the prisoner's medical needs). For all these reasons, Plaintiff cannot establish the subjective component of an Eighth Amendment claim against Defendant Beard, Defendant Neau, or Defendant Paine. *See Self*, 439 F.3d at 1234, 1236; *Toler*, 631 F. App'x at 547-48; *see also Archer v. Simmons*, 128 F. App'x 716, 718-19 (10th Cir. 2005) (holding that prisoner's allegations, including that medical staff provided substitutes for his "prescribed medicine," failed to state a plausible deliberate-indifference claim). The evidence in the record does not permit a reasonable conclusion that these Defendants "knew of a substantial risk of serious harm, and consciously disregarded it." *Boyett*, 282 F. App'x at 675 (alteration and internal quotation marks omitted). Absent a genuine issue for trial, these Defendants are entitled to summary judgment.

## CONCLUSION

As outlined herein, all claims against Defendants Neefe and Sellers are hereby DISMISSED WITHOUT PREJUDICE. The CCA Defendants' Motion for Summary

13

Judgment (Doc. No. 110) is GRANTED as to Defendants Beard, Neau, and Paine. Judgment shall be entered accordingly.

IT IS SO ORDERED this 30th day of September, 2019.

_____
CHARLES B. GOODWIN
United States District Judge